# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 21, 2022

Lyle W. Cayce
Clerk

No. 21-40720

Damonie Earl, individually and *on behalf of* all others similarly situated; Linda Rugg, individually and *on behalf of* all others similarly situated; Alesa Beck, individually and *on behalf of* all others similarly situated; Timothy Blakey, Jr.; Stephanie Blakey; Marisa Thompson, individually and *on behalf of* all others similarly situated; Muhammad Muddasir Khan; John Rogers, individually and *on behalf of* all others similarly situated; Valerie Mortz-Rogers, individually and *on behalf of* all others similarly situated; James LaMorte; Brett Noble, individually and *on behalf of* all others similarly situated; Ruben Castro, individually and *on behalf of* all others similarly situated; Fritz Ringling, individually and *on behalf of* all others similarly situated; Litaun Lewis, individually and *on behalf of* all others similarly situated; Lance Hogue, Jr., individually and *on behalf of* all others similarly situated,

*Plaintiffs—Appellees*,

*versus*

The Boeing Company; Southwest Airlines Company,

*Defendants—Appellants*.

No. 21-40720

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:19-CV-507

---

Before Smith, Duncan, and Oldham, *Circuit Judges*.
Andrew S. Oldham, *Circuit Judge*:

The plaintiffs in this class-action lawsuit allege that Boeing and Southwest Airlines defrauded them by, among other things, concealing a serious safety defect in the Boeing 737 MAX 8 aircraft. The district court certified four classes encompassing those who purchased or reimbursed approximately 200 million airline tickets for flights that were flown or could have been flown on a MAX 8. But plaintiffs have not plausibly alleged that any class member suffered either physical or economic injury from Boeing's and Southwest's alleged fraud. Plaintiffs therefore lack Article III standing. We reverse and remand with instructions to dismiss for want of jurisdiction.

## I.

## A.

This is an interlocutory appeal of a district court order granting plaintiffs' motion for class certification. Plaintiffs seek to recover under RICO for alleged fraud by Boeing and Southwest Airlines in connection with the certification and marketing of the Boeing 737 MAX 8 aircraft.

We provide only a brief summary of the alleged fraud because the particulars are largely irrelevant to the dispositive legal issues in this appeal. According to plaintiffs, defendants have a unique and "symbiotic" business relationship. As part of that relationship, Southwest only flies variants of the Boeing 737 aircraft. When Boeing announced the new MAX 8 variant in 2011, Southwest was the launch customer.

Plaintiffs allege that behind the scenes, Southwest aggressively pressured Boeing to deliver the MAX 8 without requiring pilots to undergo significant additional training. Southwest wanted Boeing to convince the Federal Aviation Administration ("FAA") that the MAX 8 and a previous 737 variant—the 737 NG—were so similar that pilots did not need to complete new flight-simulator training for the MAX 8. Instead, a short course on an iPad or computer would be sufficient. This abbreviated training program is called "Level B pilot training."

The defendants' effort to ensure Level B pilot training encountered various difficulties. Most relevant here, Boeing's decision to place more powerful engines closer to the fuselage and farther forward on the aircraft (to enhance fuel efficiency) meant that the MAX 8 handled differently from the 737 NG. So Boeing added the "Maneuvering Characteristics Augmentation System" ("MCAS") to the MAX 8. MCAS automatically adjusted the trim of the aircraft to make the MAX 8 mimic the handling and flight behavior of the 737 NG.

Plaintiffs allege that defendants omitted references to MCAS in flight crew documentation and misled the FAA about the significance and operation of MCAS. Defendants also coordinated communications to the public and the press to minimize public concern about the MAX 8. Boeing succeeded in getting Level B training approval for the MAX 8 and began delivering MAX 8 aircraft to Southwest and American Airlines. Throughout the class period (August 2017 to March 2019), MAX 8 aircraft made up at most 34 of over 700 planes in Southwest's fleet, and 28 of over 1,500 planes in American's fleet.

During Lion Air Flight 610 on October 29, 2018, a faulty Angle-of-Attack sensor on a MAX 8 fed incorrect information to the flight computer. MCAS took control of the plane and improperly pushed the nose down. The

No. 21-40720

plane crashed, killing everyone on board. On March 10, 2019, another MAX 8 flight—Ethiopian Airlines Flight 302—suffered the same fate. After this second crash, the MAX 8 was grounded worldwide.

B.

The eleven named plaintiffs filed suit in July 2019. They sought to represent everyone who purchased a ticket for air travel on Southwest or American Airlines[1] between August 29, 2017, and March 13, 2019 (the "Class Period"). They alleged the class overpaid for plane tickets: "The actual prices of the tickets that were purchased as a result of the misrepresentations by Southwest and Boeing about the safety of the MAX 8 and MAX Series Aircraft were significantly higher than the value of those tickets, which for many, if not most, passengers was zero."

The airlines moved to dismiss, arguing, among other things, that plaintiffs lacked Article III standing. The district court dismissed plaintiffs' claims for lack of standing to the extent they alleged that "if Plaintiffs had known the MAX 8 was fatally defective, Plaintiffs would never have purchased a ticket, so Plaintiffs want their money back." The court held that because this theory sought to recover for a risk of physical injury that did not materialize as to any plaintiff, it was akin to the "no-injury products liability claim" that we held insufficient to support standing in *Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d 315 (5th Cir. 2002).

---

[1] Plaintiffs included American Airlines ticket purchasers as proposed class members because, as they put it, "[t]he same Boeing-Southwest conspiracy that caused passengers to fly on a MAX 8 on Southwest Airlines . . . proximately caused passengers to fly on other airlines that flew the MAX 8, such as American Airlines (when they would not have done so but for the Boeing-Southwest conspiracy, which hid safety issues with the airplane)."

4

The district court then held, however, that plaintiffs pleaded an economic injury in fact sufficient to support standing. Specifically, plaintiffs alleged that defendants' fraudulent actions allowed Southwest and American to overcharge plaintiffs for their tickets. Absent a fraudulent scheme to conceal the MAX 8's safety defects, demand for tickets on routes flying the MAX 8 would have decreased, along with the price of those tickets. So, the theory goes, plaintiffs paid a fraud-induced overcharge at the time they bought their tickets, and they have Article III standing to recover the amount of that overcharge. The district court held that plaintiffs could proceed on this theory of Article III injury and this theory only.

Plaintiffs next moved for class certification. The district court granted the motion and certified four classes covering nearly 200 million ticket purchases. Defendants petitioned us for permission to appeal the class certification decision. *See* Fed. R. Civ. P. 23(f). We granted it. Defendants then moved us to stay district court proceedings pending the outcome of this appeal. We granted that motion too. *Earl v. Boeing Co.*, 21 F.4th 895, 897 (5th Cir. 2021).

## II.

We start, as always, with jurisdiction. "Though rule 23(f) allows a party to appeal only the issue of class certification, standing is an inherent prerequisite to the class certification inquiry. Accordingly, standing may—indeed must—be addressed even under the limits of a rule 23(f) appeal." *Rivera*, 283 F.3d at 319 (quotation omitted). Article III standing is a question of law that we review *de novo*. *Ibid.*

Article III of the United States Constitution limits the judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2; *see Cranor v. 5 Star Nutrition, LLC*, 998 F.3d 686, 689 (5th Cir. 2021). Because of that limitation, any party invoking the judicial power must establish the

"irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing requires three elements: (1) an "injury in fact" that is (2) "fairly traceable" to the "conduct complained of" and that is (3) likely redressable by a favorable court decision. *Id.* at 560–61 (quotation omitted); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

The dispute in this case concerns injury in fact. As the Supreme Court has repeatedly instructed, standing requires a claim of injury that is "concrete, particularized, and actual or imminent." *TransUnion*, 141 S. Ct. at 2203; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). That means a claimed injury must be real—"it must actually exist." *Spokeo*, 578 U.S. at 340. And it must not be "too speculative for Article III purposes." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013) (quotation omitted).

Plaintiffs contend that defendants fraudulently concealed defects in the MAX 8 that threatened passengers with a serious risk of physical injury or death. But no plaintiff alleges that he has suffered or will suffer any physical injury as a result of defendants' fraud. To the contrary, plaintiffs expressly disclaim any recovery for physical injury.

Instead, the complaint asserts plaintiffs "were harmed and suffered actual damages" because the ticket prices they paid "were significantly higher than the value of those tickets, which for many, if not most, passengers was zero." As the district court observed, there are two ways to understand this alleged injury. The first and perhaps most straightforward reading is that plaintiffs were allegedly harmed because defendants' fraud induced them to buy tickets they never would have bought otherwise. The second way to understand this allegation is that plaintiffs were harmed because defendants' fraud allowed Southwest and American Airlines to set higher fares for plaintiffs' tickets than they could or would have done absent the fraud.

Everyone now agrees the first theory of injury cannot support Article III standing under our decision in *Rivera*. That case involved a class action by plaintiffs who had been prescribed and taken an allegedly defective painkiller. 283 F.3d at 317. The *Rivera* plaintiffs alleged the painkiller was defective because of a risk of liver damage. *Id.* at 319–20. But even though other customers had been injured, the risk of liver damage had not materialized as to any plaintiff, and the painkiller had worked as advertised in every other respect. *Id.* at 319. We held that plaintiffs had "asserted no concrete injury" because they "paid for an effective pain killer, and [they] received just that." *Id.* at 320–21.

Plaintiffs therefore fall back to their second theory—what we'll call the "overcharge-by-fraud" theory. This theory seeks to recover for a purported economic injury rather than any risk of physical injury. Specifically, plaintiffs claim that if the public had known about defendants' fraudulent scheme, demand for tickets on routes flying the MAX 8 would have dropped, so the airlines would have been forced to lower fares and plaintiffs would have paid less for their tickets. Defendants' fraud thus allowed them to inflate demand for tickets on MAX 8 routes and overcharge their customers.

Plaintiffs have attempted to show that they suffered this sort of economic injury through the report and testimony of their principal expert, Professor Greg Allenby. Professor Allenby used conjoint analysis—a survey-based technique—to show that demand for flights on MAX 8 aircraft would have lessened if the public had known the information about the MCAS defect that was allegedly concealed by defendants' fraud. He conducted his analysis as follows: First, he surveyed respondents about several hypothetical flight options they could choose, given variables including the number of stops, type of aircraft, and price. Second, Allenby showed respondents a short video with a message about the MAX 8's MCAS defect. Third, Allenby

again asked respondents to choose between hypothetical flight options, some of which were scheduled on MAX 8 flights, and some of which were not. Unsurprisingly, respondents showed less willingness to fly on MAX 8 flights after watching a video discussing the MCAS defect.

Notwithstanding this conjoint study, plaintiffs' theory of injury rests on two unsupportable inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (quotation omitted)). First, plaintiffs assume that if there was widespread public knowledge during the class period of the MCAS defect, Southwest and American Airlines would have continued offering the same MAX 8 flights—but with a price discount to compensate for the heightened risk that passengers would die. But the facts don't support this inference. *See id*. at 682. The more plausible inference is that Southwest and American would have offered *zero* MAX 8 flights until the defect could be fixed. And on this latter, more obvious inference, ticket fares would have likely gone *up* because the airlines' usable fleets would have been smaller in the meantime. (In other words, the airlines' supply of seats would have gone down, demand would have stayed the same, and prices would have risen as a result.)

Second, plaintiffs assume the FAA would have permitted airlines to fly the MAX 8 even with full knowledge of the MCAS defect. This inference is even more implausible than the first. That's because in reality, after the public learned the full extent of the risk caused by the MCAS defect, regulators worldwide grounded the MAX 8. The FAA, for example, grounded the MAX 8 for 20 months. So in all likelihood, if the FAA had learned the full extent of the MCAS defect sooner—which plaintiffs contend would have happened absent defendants' alleged fraud—then the MAX 8

would have been pulled from plaintiffs' routes. But again, that would have caused ticket prices to go up, not down, because of the reduced aircraft supply in Southwest's and American's fleets.

Plaintiffs do not contest any of this. Instead, when pressed at oral argument, plaintiffs' counsel contended that rejecting their theory of standing would imperil all sorts of fraud litigation. That's because it's always the case that in a hypothetical world where the fraud didn't happen, anyone injured by the fraud would have been better off. *See* Oral Argument at 31:50. But that misses the point. In an ordinary fraud lawsuit—a pyramid scheme, for example—there are identifiable victims who lost money that wouldn't have been lost in a counterfactual world without the fraudulent scheme. *See, e.g.*, *Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629, 634 (5th Cir. 2016) (en banc) (suit by plaintiffs who lost money participating in a pyramid scheme). By contrast, the plaintiffs in this suit have not plausibly alleged that they're any worse off financially because defendants' fraud allowed Southwest and American Airlines to keep flying the MAX 8 during the class period. If anything, plaintiffs are likely better off financially. If the MCAS defect had been widely exposed earlier, the MAX 8 flights plaintiffs chose would have been unavailable and they'd have had to take different, more expensive (or otherwise less desirable) flights instead.

In sum, plaintiffs have not plausibly alleged any concrete injury. *See Spokeo*, 578 U.S. at 340. They concededly have suffered no physical harm. They have offered no plausible theory of economic harm. At bottom, plaintiffs complain of a past risk of physical injury to which they were allegedly exposed because of defendants' fraud. But because that risk never materialized, plaintiffs have suffered no injury in fact and lack Article III standing. Their case therefore must be dismissed.

No. 21-40720

\*       \*       \*

The district court's class certification order is REVERSED, and the case is REMANDED with instructions to DISMISS the case for lack of jurisdiction.